# The Great Western Railway Company of Canada

## *v.*

## Thomas W. Burns *et al.*

1. RAILWAY COMPANY—*common carriers—their duty.* A railway company having received a large quantity of wool for transportation to Boston, carried it to within fifty miles of the terminus of their road, where, owing to the obstruction of the road with which it connected on the route to Boston, from snow, the wool was stored for two months, within which time the price declined in the Boston market: *Held*, that the company were liable, if for no other reason, because the agents of the company knew that the road was so blocked with freight that the wool could not go through in a reasonable time, and failed to inform the shipper of the fact, that he might have either sold at the point whence shipped, or have selected another route if he had so chosen.

2. The company, as a common carrier, having received the wool without giving notice, were required to carry it through in a reasonable time or respond in damages growing out of the delay.

3. The company were liable for another reason: When they stored the wool, there were twelve hundred car loads of freight stored ahead of the wool, and when the track of the other road was cleared and freight could be shipped through, there was sent forward nineteen hundred car loads before this wool was reshipped. The wool should have been reshipped in its turn, and the road had no right to give freight, shipped after it was, the precedence. Nor was the fact, that a portion of the latter shipments were perishable freight and live stock, any legal excuse for the delay in reshipping the wool, as they should have declined to receive such freight until it could be sent through without delaying freight having the precedence.

4. Nor is it any defense that the wool was shipped from the warehouse in which the company had stored it, in advance of other goods stored there before the wool, and having the precedence, as, if the company had received no new freight until the blockade was removed, the wool would have gone through several weeks earlier than it did, and this is the real ground of the liability of the company. A common carrier has no right to store a part of the freight received for transportation, and leave it there whilst he receives new freight and sends it through, and when it does so it must make compensation to parties injured thereby.

APPEAL from the Superior Court of Cook county; the Hon. JOSEPH E. GARY, Judge, presiding.

Messrs. WALKER & DEXTER, for the appellant.

Messrs. H. W. & D. K. TENNEY, for the appellees.

Mr. CHIEF JUSTICE LAWRENCE delivered the opinion of the Court:

On the 26th of January, 1865, Burns & Co. delivered to the Michigan Central Railroad Company, at Chicago, two hundred and eighty-three bales of wool, consigned to Boston. On the 2d and 4th of February, the wool was received by the Great Western Railway Company, the appellant, at Detroit, and on the 7th and 8th of the same month forwarded eastward to Hamilton, a point forty-three miles west of its eastern terminus, at Suspension Bridge. It was there unloaded and

placed in a warehouse, where it all remained until March 13th, when six bales were forwarded, and on the 3d, 7th and 8th of April, two hundred and seventy-seven bales, comprising the rest of the wool, were sent forward to their destination. In the meantime there had been a great decline in the price of wool, and this suit was brought to recover the damages suffered by the appellees in consequence of this detention.

It appears, from the evidence, that the winter of 1864–5, was one of great severity, and the snow fell to a very unusual depth over the region traversed by the New York Central Railroad, which connects with appellant's road at Suspension Bridge. One of the effects of this kind of weather had been to block up, with snow, the track of the New York Central, and disable its locomotives and cars to such an extent that it was wholly unable to carry all the freight brought over the Great Western. This state of affairs began about the middle of December and continued to the middle of April. When the wool in question was shipped, the means of storage at the eastern terminus of the road had been already exhausted, and the appellant was obliged to unload such freight as the New York Central could not carry, at the stations most convenient for safe-keeping and reshipment, one of which was Hamilton.

It appears, however, the stoppage in the transfer of freight from one road to the other, was not complete. From the 2d of February, when the wool was stored at Hamilton, to the 5th of April, taking that day as the average date of shipment from that point, the New York Central received from the appellant an average of thirty-one loaded cars per diem, amounting in the aggregate to nineteen hundred and twenty-two cars. At the time the wool was delivered to defendant, the accumulation upon its line already amounted to about twelve hundred cars. It thus appears that, during the period when this wool lay in store, the defendant actually transferred to the New York Central an amount of freight equal to about seven hundred cars more than the entire accumulation, at the time the defendant received the wool. A great amount of

freight was received by the defendant at Detroit, carried to Suspension Bridge and there delivered to the New York Central, while the appellees' wool was in store at Hamilton.

Upon this state of facts, the jury rightly found a verdict for the appellees.

If there were no other question in the case, we should be much inclined to hold this railway company had committed a wrong to the appellees by receiving their wool for shipment without explaining to them that there was a vast amount of freight in store upon its lines, and entitled to precedence in being forwarded. By the mere act of accepting the freight without explanation, the company undertook to transport and deliver it within a reasonable time, and, although the defendant was in nowise responsible for the condition of the New York Central, yet, as a consequence of that condition, its own lines were already blocked with twelve hundred car loads of freight entitled to immediate delivery, and which could not, under the most favorable circumstances, be delivered for many days. The company knew that its lines were in such condition as to incapacitate it for performing its full duty as a common carrier by delivering goods not only in safety, but in a reasonable time. In order to save itself from liability, it should have disclosed to shippers the condition of its road. These appellees, if thus informed, might have sought another line of transportation, or have chosen to sell their wool for what it would bring in Detroit. They could then have exercised their own judgment. As it was, the company, by receiving this freight without explanation, placed it for a very unusual period beyond the control of appellees, although its immediate sale may have been of vital importance, and did this without their consent.

But, independently of this question, the verdict of the jury was correct, because, after this wool was in store at Hamilton, the defendant continued to receive freight at Detroit, large amounts of which were carried to Suspension Bridge and there delivered to the New York Central without delay. It

is urged by counsel for appellant, that the freight to which precedence was thus given consisted either of dutiable goods, or was of perishable character, or live stock.   By dutiable goods are meant such goods coming to this country from Canada as were liable to the payment of a duty.   Such goods leaving Detroit in locked cars, could, if the cars remained unopened, re-cross the boundary at Suspension Bridge without the payment of a duty.

As to perishable freight, or live stock, it is very true, if shipped at the same time with other freight, the company might properly give it precedence if necessary to its preservation.   As to dutiable goods, we see no reason why they should, in any case, be entitled to precedence over other goods of the same character.

But the question here is, not between the wool of appellees and perishable freight shipped at the same time, but between that and perishable freight shipped subsequently, and at a time when the defendant knew that, by accepting such shipment, it was, to that extent, delaying the forwarding of appellees' property.   The defendant had no right to consign appellees' wool to a warehouse at Hamilton for two months, and during that period deliver to the New York Central large amounts of freight received subsequently to the shipment by appellees.   This was, in substance, the instruction given by the court below to the jury, upon which they doubtless found their verdict, and the instruction was clearly right. The company had no right to receive fresh shipments which would prevent the performance of its duties in regard to shipments already made.   Its duty was to deliver these in their order, and it should have said to persons seeking to ship live stock or perishable goods, that the road, without the fault of the defendant, had become so blocked with freight that no further goods could be received until the accumulation had been removed.

It is urged by appellant, that when the contents of the warehouse at Hamilton were sent forward, the wool in question

was forwarded in advance of other freight in the warehouse received at an earlier date and entitled to precedence. That may be true, but the fact remains, that if the company had declined to receive any new through freight from west to east after the appellees' wool was shipped, until the blockade of its lines was removed, the latter would have reached its destination some weeks earlier than it did, and that is the solid ground on which this verdict rests. A common carrier has certainly no right to place a part of his freight in store, and there leave it, while he continues to receive and transport new freight. This company was sacrificing the rights of the appellees in order to keep up, to a considerable extent, the through business of the road. It may have been so situated that it could not well decline to do this, but it must make compensation to injured parties.

The instruction given by the court on its own motion stated the law to the jury with substantial correctness, and the verdict upon the evidence was just.

*Judgment affirmed.*